Connon, J.
Introduction
This dispute arises over whether the plaintiffs proposed development at New Seabury is exempt from the defendant’s review as a Development of Regional Impact (DRI) pursuant to Section 13 of the Cape Cod Commission Act, St. 1989, c. 716 (Act).
The plaintiff, New Seabury Properties, L.L.C.[1] (NSP), filed suit against the defendant, Cape Cod Commission (Commission), alleging breach of contract and the covenant of good faith and fair dealing, petitioning for declaratory relief to establish the project’s substantial compliance with the special permit and entitlement to the statutory exemption, and for monetary damages and attorneys fees. The defendant then filed a counterclaim petitioning for declaratory relief to determine that NSP’s 1964 Special Permit expired in 1994 and is therefore no longer a valid development permit triggering the application of Section 22(b) of the Act, and that the Commission has jurisdiction to review as a development of regional impact (DRI) the development described in the Notice of Project Change (NPC). The defendant also seeks relief in the form of an order compelling NSP to submit the NPC Project to the Commission for DRI review, to cease and desist all development work on the NPC Project pending Commission review of the project and to restore any areas disturbed by NSP prior to completion of that review.
NSP has moved for summary judgment on the Commission’s counterclaim arguing that the Commission’s challenge to the validity of the Special *276 Permit is unauthorized by the Cape Cod Commission Act, is contrary to the Commission’s practice from its inception in 1989 of deferring to the issuing municipal agency on issues of municipal entitlements, and is improper under G.L.c. 40A. Alternatively, NSP argues that the Commission is incorrect as a matter of law that the Special Permit expired in 1994.
The Commission not only opposes NSP’s motion, but has also moved for partial summary judgment on Count I of the Plaintiff s complaint. The Commission argues that it has jurisdiction over New Seabuiy’s new development proposal because the 1964 Special Permit has expired. In the alternative, the Commission argues' that even if the 1964 Special Permit has not expired, it still has jurisdiction to review the proposed development since the proposed development is not in “substantial compliance” with the 1964 Special Permit’s terms which are essential before the exemption in Section 22(b) is triggered.
NSP opposes the Commission’s partial motion for summary judgment on Count I, arguing that NSP’s proposed development is exempt from Commission review because the Special Permit was issued by the Town of Mashpee’s Board of Appeals in 1964, which was before the establishment of the Act, and was properly extended by a vote of 50% of the restricted owners. Furthermore, NSP argues the development is in “substantial compliance” with the Special Permit. As such, NSP argues that it is grandfathered in and exempt from Commission review as permitted under Section 22(b) of the Act since its development is in “substantial compliance” with NSP’s 1964 Special Permit.
Background
On or about February 21, 1964, the Popponesset Corporation[2] petitioned the Town of Mashpee’s Board of Appeals for approval for the development of 1,240 acres of registered land in a portion of New Seabury, Mashpee, under the Town’s cluster zoning by-law. The cluster zoning by-law authorized an owner of 100 or more acres of land to petition the Board of Appeals to develop a project under “cluster zoning principles."
After notice and a hearing, the Mashpee Board of Appeals unanimously voted to approve Popponesset Corporation’s proposed development. In exchange for the special permit, as required by the cluster zoning by-law, the Popponesset Corporation quitclaimed four parcels of registered land, located in Mashpee, to the Town of Mashpee. The land conveyed had restrictions which were imposed and ran with the land for thirty years. A provision in the by-law authorizes an extension of the restriction of not more than twenty years at a time under two different methods. The first method was to be followed for common scheme development. The second method was to be followed for all other developments. Further restrictions, outlined in the 1964 QuitclaimDeed (hereinafter “Deed”), limited the number of dwellings and the number of square feet of commercial area permitted in each of the 29 sections of the property.
On or about December 27, 1971, New Seabury Corporation[3] and the Town of Mashpee executed a document amending the 1964 Deed Restrictions. This agreement modified the 1964 Deed Restriction by reallocating 1,657 dwelling units from certain sections to other sections located on the property.
In or around 1988, New Seabury Corporation attempted to extend the Deed of Restriction for another twenty years as permitted in the 1964 Quitclaim Deed. New Seabury Corporation petitioned the Mashpee Town Meeting in 1990. The Mashpee Town Meeting rejected New Seabury Corporation’s proposal. New Seabury Corporation then sought to extend the 1964 Deed Restrictions by obtaining written approval from owners of more than 50% of the “restricted area.” New Seabury Corporation believed that by securing the agreement of the owners of a majority of the land burdened under the restrictions of the 1964 Quitclaim Deed, and by executing a document extending the 1964 Deed Restriction, it had properly extended the 1964 Deed Restrictions until July 4, 2010. This 1990 Extension of Deed Restriction was recorded at the Barnstable Registry District.
In or about 1990, New Seabuiy Company Limited Partnership (hereinafter “NSCLP”)[4] proposed the construction of two waste water treatment facilities to be constructed at New Seabuiy. On or about August 27, 1990, the Mashpee Board of Health referred the proposed waste water treatment plant project to the Commission for determination as to whether the project was exempt from Commission jurisdiction under Section 22(b) of the Act. On or about October 25, 1990, the Commission issued a decision finding that the proposed waste water treatment plant project was not exempt under Section 22(b) of the Act.
NSCLP filed a complaint in Barnstable Superior Court appealing the Commission’s decision. On or about June 28, 1993, the Commission and NSCLP entered into an agreement in settlement of NSCLP’s November 21, 1990 Complaint. On or about June 30, 1993, by agreement of the parties the Agreement for Judgment was entered as a judgment in Barnstable County Superior Court.
On or about January 29, 1990, the Town of Mashpee voted at a Special Town Meeting to authorize and direct the Board of Selectmen to enter into an agreement with the NSCLP to reallocate the development of 400 dwelling units and 160,000 square feet of commercial space from Sections 20, 23, 24, 25, and 26 to Section 5. This Agreement, entered into in 1995, is recorded in the Barnstable Registry District.
On or about May of 1996, the Mashpee Water District petitioned the Town of Mashpee Building In *277 spector to rescind the 1995 Selectmen’s Agreement and to rescind and revoke all permits issued under the 1995 Selectman’s Agreement. The Mashpee Building Inspector denied the petition.
On or about June 26, 1996, the Mashpee Water District filed an appeal to the Mashpee Board of Appeals from the decision of the Mashpee Building Inspector. On or about September 24, 1996, the Mashpee Board of Appeals unanimously denied the appeal. Neither the Mashpee Water District nor the Commission took an appeal from the 1996 Board of Appeals Decision.
On or about January 22, 2001, the Mashpee Conservation Commission submitted a request for the Commission to determine whether the New Seabury Development Project constitutes a DRI for which the Commission has jurisdiction under the Act.
On or about December 28, 2001, the Cape Cod Commission staff issued a report addressing the New Seabury Development Project’s qualifications for review as a DRI and its alleged exemption under Section 22(b). The Staff Report recommended in favor of the Commission exercising jurisdiction over the proposed New Seabury Development Project.
After a hearing and discussion on the issue, on or about January 24, 2002, the Commission issued a written decision of its jurisdictional determination. The jurisdictional decision found that the New Seabury Development Project “qualifies as a [DRI] under Sections 12(i) and 13(b) of the Act” based on the fact that it was required to file an Environmental Impact Report under the Massachusetts Environmental Policy Act; proposed division of land into thirty or more residential lots; proposed division of land into ten or more business, office or industrial lots; proposed construction with a floor area of greater than 10,000 square feet; proposed to create or add thirty or more residential dwelling units; proposed to develop a mixed use residential dwelling units; and proposed to develop a mixed use residential and non-residential development with a total area greater than 20,000 square feet.
Further, the jurisdictional decision found that the New Seabury Development Project was not exempt from Commission jurisdiction under Section 22(b) because the proposed development is “not in substantial compliance” with the 1964 Special Permit. In finding that the New Seabury Development Project was not exempt from the Commission jurisdiction by Section 22(b), the Commission applied criteria to define what constitutes “substantial compliance.” In 1992, the Commission adopted a policy defining “substantial compliance” as that term is applied under Section 22(b).
In February of 2002, New Seabury Properties appealed the Decision of the Commission. In April 2002, the parties filed with this Court cross motions for partial summary judgment. This Court issued its Memorandum of Decision and Order on Parties’ Cross Motions for Summary Judgment on October 21, 2002 (hereinafter “Decision”). In ruling on the parties’ other claims, this Court noted in the Decision that the central outstanding legal issue in the litigation is the validity of the Special Permit, which was found to encompass three documents: the 1964 Facts and Decision issued by the Town of Mashpee’s Board of Appeals, the 1964 Quitclaim Deed from the Popponesset Corporation to the Town of Mashpee and Section F.V. of the Mashpee Zoning By-law. This Court then indicated that until it was provided with additional information regarding the intent of the drafters of the Deed Restrictions, regarding the mechanism for extending their term, the Court would be unwilling to consider the Special Permit’s validity.
The Cape Cod Commission Act carves out an exception to the Commission’s authority in Section 22(b) which explains that “[t]his act shall not apply to any development which prior to July first, nineteen hundred and eighty-nine has received any one of the following ... a special permit or variance under chapter forty A, . . . and which development is constructed or is thereafter constructed in substantial compliance therewith.” Nowhere in the Act is “substantial compliance” defined. Therefore the Commission drafted a three-part criteria which would assist the Commission in determining which projects are in substantial compliance under Section 22(b) of the Act. However, this Court found that when adopting policy and defining substantial compliance, the Commission failed to properly follow the procedure enumerated in the Cape Cod Commission Act. This Court found that the substantial compliance policy was properly drafted by the Commission Staff, reviewed by the Cape Cod Commission Subcommittee, and approved by the Commission. However, the Substantial Compliance Policy was not submitted to the Barnstable County Assembly of Delegates, nor was it adopted as a Barnstable County ordinance as required by the Act. Cape Cod Commission Act, St. 1989, c. 716 §6(a). As such, this Court ordered that the Commission properly follow the procedure for enacting the policy prior to determining whether NSP properties are in substantial compliance with the 1964 Special Permit.
On Januaiy 2, 2003, New Seabuiy Properties filed a Notice of Project Change (NPC) altering the development proposed in “Section 5" from that proposed in the SFEIR. The NPC reduced residential development from 425 units to 25 units (this includes the elimination of a 150-room hotel), and increased commercial space from 80,000 sf to 145,000 sf, both amounts allowed under the 1964 Special Permit for Section 5.
In accordance with the order of this Court, the substantial compliance policy was adopted as a regu *278 lation through a review and vote of the Cape Cod Commission on November 21,2002 and December 19, 2002, and then by the Assembly of Delegates on March 5, 2003. Furthermore, the Commission applied the new, properly adopted, Substantial Compliance Policy to the three documents that encompass the Special Permit: the 1964 Facts and Decision issued by the Town of Mashpee’s Board of Appeals, the 1964 Quitclaim Deed from the Popponesset Corporation to the Town of Mashpee and Section F.V. of the Mashpee Zoning By-law. After this review, the Commission concluded that the SFEIR project does not substantially comply with the 1964 Special Permit, since the SFEIR development does not meet requirements two or three of the substantial compliance policy. However, the Commission found that in modifying plans for Section 5, the NPC proposal generally complies with the allowing development numbers of the 1964 Permit. More specifically, the Commission found that there was some site design and disturbance to open space that could possibly cause issues with roadways, transportation, and natural resources. Nevertheless, the Commission stated since these impacts could be reduced through various modification, the project as modified in the NPC is in substantial compliance with the 1964 Special Permit.
Discussion Summary Judgment
This Court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving pariy to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 713-14 (1991). The moving parly bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The Commission moved for partial summary judgment, and NSP opposes this motion. The partial motion for summary judgment is appropriate because there are no genuine issues of material fact, and the only issue to be decided is whether NSP’s proposed development is exempt from the Commission’s jurisdictional review under Section 22(b) of the Act. Cape Cod Commission Act, St. 1989, c. 716, §22(b).
Common Scheme Compliance
The Commission argues that NSP’s attempt to extend the 1964 Special Permit is void because NSP does not qualify as a common scheme development under G.L.c. 184, §27(b)(1), and because NSP did not record a “notice of restriction” as required for “other restrictions” under G.L.c. 184, §27(b)(2). G.L.c. 184, §27(b)(1) and (2). NSP argues that although neither the 1964 Special Permit nor the 1964 Quitclaim Deed indicates that the NSP properties are a common scheme development, the common scheme development can be established through interpretingtheintentoftheoriginaldesigners/drafters of the NSP properties.
As previously indicated, this court initially declined to consider the issue of common scheme development because the intent of the original drafters of the NSP development is a question of fact not to be determined in a summary judgment motion. However, the record now indicates that the parties attempted to gather extrinsic evidence that would reveal the intent of the drafters of the initial New Seabury development documents. As of the filing of these motions, both NSP and the Commission have affirmed that neither party has knowledge of any extrinsic evidence regarding the intent of either NSP (with respect to its 1964 deed to the Town of Mashpee) or the Town of Mashpee (with respect to the grant of the 1964 special permit to NSP). As such, the issue of the validity of the special permit is a question of law to be determined based on the documents of which it is comprised.
Massachusetts law makes clear that “deeds should be ‘construed to give effect to the intent of the parties, unless inconsistent with some law or repugnant to the terms of the grant.’ ” Harrison v. Marcus, 396 Mass. 424, 429 (1985) (quoting Bass River Savings Bank v. Nickerson, 303 Mass. 332, 334 (1939)). In interpreting a deed, its meaning must be “derived from the presumed intent of the grantor.” Sheftel v. Lebel, 44 Mass.App.Ct. 175, 179 (1988). The grantor’s intent is “ascertained from the words used in the written instrument, construed when necessary in the light of the attendant circumstances.” Id. Similarly, the parties’ intent is determined by “the words used, interpreted in light of the material circumstances and pertinent facts known to them at the time [the deed] was executed." Bessey v. Ollman, 242 Mass. 89, 91 (1922). Furthermore, in the interpretation of an easement created by conveyance, the primary manner in determining the meaning of the conveyance is through its language. Sheftel v. Lebel, 44 Mass.App.Ct. at 179. As such, in the present case the Court must look to the Deed to determine whether the grantor intended a common scheme.
In determining whether a grantor intended a common scheme, Massachusetts courts have noted that “the legal theory behind the rule related to a common scheme ‘is not easy to find.’ ” Gulf Oil Corp. v. Fall River Housing Authority, 364 Mass. 492, 497 (1974) (quoting Snow v. Van Dam, 291 Mass. 477, 482 (1935)). Furthermore, the Massachusetts courts have refused to follow a narrow interpretation in finding a common scheme. See Gulf Oil Corp. v. Fall River Housing Authority, 364 Mass, at 497. As such, it has been determined that “[n]either the restricting of every lot within the area covered, nor absolute identity of restrictions upon different lots is essential to the existence of a [common] scheme.” *279 Snow v. Van Dam, 291 Mass, at 483. It is merely necessary that the new property owners enter the planned development with knowledge of its mutual benefits and obligations and understand “that the plan envisions an orderly and harmonious development for the entire area.” Gulf Oil Corp. v. Fall River Housing Authority, 364 Mass, at 497. This knowledge need not be established through express language in the deed, but can instead be construed given the intent of the grantor. See Bacon v. Sandberg, 179 Mass. 396, 398 (1901) (“the criterion in this class of cases is the intent of the grantor in imposing the restrictions”).
An orderly and harmonious development, however, does not require physical uniformity. In fact, the SJC stated “(i)t has never been held that a common scheme of this type must provide the same uses and building limits on every lot in one planned area.” Gulf Oil Corp. v. Fall River Housing Authority, 364 Mass, at 498. Furthermore, although “(t]he trend of modern planning is to mix various uses and types of building within the same area,” this mixed use “does not make the scheme any the less a common scheme.” Id.
In the present case, the individual landowners are bound to the Special Permit’s aggregate density and sectional allocation. The restrictions set forth in the Deed align with those types of restrictions found within the Massachusetts case law. The Deed explicitly restricts the number of dwelling units and square feet of commercial area in each section of the plan. These requirements characterize a system of mutual benefits and obligations designed to maintain the quality and character of the area, and promote an orderly and harmonious development.
Furthermore, the Deed provides for a specific mechanism for extension of the deed restrictions — a 50% vote of the restricted owners.[5] This mechanism is the same as that under G.L.c. 184, §127(b)(1) for extensions of deed restrictions, which applies exclusively to common schemes. The fact that the original drafters chose the same method of extension as the statutoiy method for common schemes tends to demonstrate that they intended to form a common scheme. Furthermore, the deed conveys only four parcels (of the total of approximately 1,240 acres) to the Town of Mashpee. This fact would also seem to suggest intent by the grantor to form a common scheme, since four parcels is the exact statutoiy minimum requirement for common schemes. Accordingly, the plain words of the Deed along with the circumstances of the conveyance suggest that the original intent of the grantors of the Deed intended to create a common scheme.
Valid Extension of Restrictions
Since the court has found that a common scheme was created, the next issue is whether the land restrictions were properly extended. The procedures for enforcing land restrictions created after 1961 are set forth in Massachusetts General Laws c. 184, §27. See G.L.c. 184, §27(b). Section 27(b)(1) of the statute allows for the extension of a restriction imposed through a common scheme. G.L.c. 184, §27(b)(1). Pursuant to this section, the restriction may be extended by the consent of the owners of fifty percent or more of the restricted land. See id. The record reveals that in 1990, NSP collected approvals from the owners of more than fifty percent (50%) of the land subject to the deed restrictions and filed a notice of extension. By means of this fifty percent approval, NSP properly extended the deed restrictions pursuant to both G.L.c. 184, §27(b)(1) and the express provision of the deed.
Substantial Compliance with the 1964 Special Permit
Since the 1964 Special Permit was validly extended, the next issue is whether NSP’s proposed development is in “substantial compliance” with the 1964 Special Permit so as to preclude the Commission’s jurisdiction. Section.22(b) of the Act exempts from Commission jurisdiction and review any development that received a special permit prior to July 1, 1989, provided that the development is in “substantial compliance” with the special permit issued. Cape Cod Commission Act, St. 1989, c. 716 §22(b). The evidence is undisputed that NSP[6] received a special permit from the Town of Mashpee’s Board of Appeals in 1964. This special permit was issued prior to July 1, 1989, as required by Section 22(b) of the Act, and was properly extended in 1990 through a fifty percent approval of the restricted landowners. Id. at §22(b). Therefore, the Court finds that NSP may be exempt from the Commission’s review if NSP’s proposed development plan is in “substantial compliance” with the 1964 Special Permit.
Definition of “Substantial Compliance”
Pursuant to Section 4(a) of the Act, “(t]he commission shall have those powers necessary convenient to cany out the purposes and provisions of this act, including but not limited to” a number of enumerated powers detailed in the Act. Id. at §4(a). The Act does not define what constitutes “substantial compliance” within the meaning of Section 22(b). Id. at §22 (b). Therefore, the Court finds that pursuant to Section 4(a), the Commission is authorized to define “substantial compliance” for purposes of interpreting the Act and carrying out its intent. Id. at §4(a).
Section 6 of the Act details how a new policy or regulation is to be enacted and incorporated into the Act. Id. at §6. The Act authorizes the commission to
prepare proposed regulations of general application to enable it to fulfill its duties under the act... The commission shall submit the proposed regulations for adoption by ordinance to the assembly of delegates. The assembly of delegates shall then hold at
*280 least one public hearing to consider the proposed regulation. Within sixty days after the receipt of-the proposed regulations, the assembly of delegates shall either adopt the proposed regulations by ordinance or return the proposed regulations to the commission for restudy and redrafting.

Id.

In 1992, the Commission adopted a policy defining “substantial compliance” for the purpose of interpreting “substantial compliance” in Section 22(b). Id. at §22(b). As previously stated, this Court ordered the Commission to properly follow the procedure enumerated in the Cape Cod Commission Act for enacting a policy and interpreting substantial compliance, as provided for in Section 6(a) of the Act. Id. at §6(a). The record demonstrates that the Commission, in accord with the order of this Court, properly enacted a policy interpreting substantial compliance. The substantial compliance policy was adopted as a regulation through a review and vote of the Cape Cod Commission on November 21, 2002 and, again on December 19, 2002, and then by the Assembly of Delegates on March 5, 2003. The properly adopted interpretation of substantial compliance is as follows:
The regulation lists three criteria in determining whether a project is in substantial compliance. All three criteria must be met for a project to be deemed to be in substantial compliance. Projects deemed not to be in substantial compliance are subject to DRI review provided a DRI threshold is met. The project is in substantial compliance if:
1) the proposed project and use reflect the nature and purpose of the project and use in the original local approval; and
2) the changes do not result in the requirement for additional local development permit review, in the form of a new permit, approval or a modification to the original approval; and
3) the changes do not result in different or increased impacts, as compared with the original local approval, to the interests protected by the Cape Cod Commission Act and the Regional Policy Plan.
Cape Cod Commission Enabling Regulations, §6(c)
Does NSP’s Project Substantially Comply with the 1964 Special Permit?[7]
As previously stated, New Seabury filed a Notice of Project Change (NPC) with MERA on January 20, 2003, which altered the proposal for Section 5 of the project. The NPC reduces residential development from 425 units to 25 units (including the 150-room hotel), and increases commercial space from 80,000 sf to 145,000 sf.[8] The reductions made in the NPC meet the three requirements for the substantial compliance test. First, the nature and purpose of the proposed development is consistent with the Deed’s authorization for various residential, commercial, and recreational construction. Furthermore, the reduction in development density proposed in Section 5 of the SFEIRto those limits of the NPC precludes any additionallocaldevelopmentpermitreviewintheform of a new permit, approval or a modification to the original approval. Finally, this density reduction for Section 5 signifies that there will be no significant impact to resources protected under the Cape Cod Commission Act, as compared to those originally allowed in the 1964 Special Permit. As such, NPC is in substantial compliance with the 1964Special Permit.
In sum, the court finds that the original intent of the grantors of the Deed was to create a common scheme. In addition, as a common scheme, the approval by fifty percent of the restricted owners properly extended the deed restrictions pursuant to both G.L.c. 184, §27(b)(l) and the express provision of the deed. Furthermore, the density reductions of Section 5 made in the NPC brings the project into substantial compliance with the 1964 Special Permit. Consequently, NSP’s project is exempt from Commission review as permitted under Section 22(b) of the Act since its development is in “substantial compliance” with NSP’s 1964 Special Permit.
ORDER
It is hereby ORDERED that the Defendant’s motion for partial summary judgment on Count I of Plaintiffs complaint is DENIED. It is further ORDERED that the Plaintiffs motion for summary judgment on Defendant’s counterclaim is ALLOWED.

 Plaintiff is currently incorporated as a Massachusetts Corporation entitled as New Seabury Properties. Prior to this title it was incorporated as Popponesset Corporation.

 Popponesset Corporation is a predecessor of the New Seabury Properties (NSP).

 New Seabury Corporation is also a predecessor of the New Seabury Properties (NSP).

 NSCLP was a successor to New Seabury Corporation.

 See Popponesset Quitclaim Deed (“The premises hereby conveyed are benefited by the following restrictions ... for thirty years from this date unless extended for further periods of not more than twenty years at a time by owners of record, at the time of registration of extension, of fifty percent or more of the land shown on the Plan, by an instrument or instruments registered in accordance with the provisions of Section 27 of Chapter 184 of the General Laws”).

 Although NSP is cited as having received the 1964 Deed, the 1964 Deed was actually issued to NSP’s predecessor, Popponesset Properties.

 This court will not consider the substantial compliance of the SFEIR proposal, since the motions before the court focus on the Notice of Project Change.

 The original Quitclaim Deed indicates the maximum number of dwelling units at 25 units and the maximum number of square feet of area devoted to commercial space at 180,000, which includes the sum of the floor areas of any building but excludes the customer parking area.